Good morning, Your Honor. Ali Kamarid, appearing on behalf of Appellant Kalantari, may it please the Court. Your Honor, the basics of this issue is there's a question with regard to contracts entered into by Mr. Kalantari, the plaintiff in this case, with Iranian entities to obtain rights to show motion pictures of Iranian origin in the United States and Canada. We essentially have three contracts. One contract has a single upfront payment provision. Two contracts have a upfront pending provision as well as royalty-based provisions. Based on the assignments that Mr. Kalantari obtained, he applied for and obtained registrations from the United States Copyright Office, and the name of the owners of the entities in Iran are on the copyright registrations. The motion pictures, which are mostly in the Farsi language, are directed to the Farsi-speaking community of the United States and Canada. Plaintiff Kalantari then advertised those motion pictures by indicating the time, place, and dates of the showing of the motion pictures, and also charged patrons for attending those theaters. Could you help me a bit on the actual copyright aspect? You say that the name of the Iranian company is on the copyright registration certificates. That's correct, Your Honor. And you obtained them how? Your Honor, it's the very simple process. The application is submitted to the Copyright Office. It is indicated on there who has assigned, who has the, who is the author of the motion pictures. Which is the Iranian. That's correct. Also on the copyright registrations, it is indicated that Iran is the country of national origin of the owners of the registration that has been assigned to Mr. Kalantari. That application is submitted to the United States Copyright Office. The United States Copyright Office is not a rubber-stamping facility. They do analyze to see whether there is a right to issue that registration. Once they make that determination, they will issue the registration. And, Your Honor, the main piece of legislation which is important in this case is the IEPA, which is the International Economic Emergency Powers Act. This act gives broad powers to the President to regulate trade with countries which there is a perception that there is a threat to the national security of the United States. However, from the IEPA, Congress has carved out exceptions. Most notably, it is indicated that the authority granted to the President by this section does not include the authority to regulate or prohibit directly or indirectly the importation from any country or the exportation to any country, whether commercial or otherwise, regardless of format or medium, any information or informational materials, which, by definition, includes also films. Now, there are three important notes about the IEPA. Number one, it does not make a distinction between importation or exportation. That is necessarily. If there is a restriction on importation, that restriction will also apply to exportation. Number two, there is no distinction between countries under the regulation and countries outside of the regulations. There is no special rules for countries that are within the regulation of what can be done and rules applying for countries that are not under the regulation of what can be done. They're both treated equally. The third important thing is that Congress balanced the rights of the First Amendment of Americans against any threat that the embargoes could possibly cure, and it determined that the First Amendment rights of Americans was more important. In fact, according to the House conference report, it is indicated that commercial information materials were exempted from the general prohibitions of the regulations to ensure that the embargo did not ban or restrict the import or export of information protected under the First Amendment. That's House conference report number 103-482. Now that takes us, that is the Congressional Act that takes us to the regulations of Part 31 CFR 560, which is the Iranian transaction regulations promulgated by the Office of Foreign Assets Control or OFAC. There's four sections in these regulations which are important. 560.210, which is entitled Exempt Transactions. Part C of that indicates, again, the same thing that I read from the IEPA, namely that the exportation or importation of information, informational materials, is exempt from these regulations. The second important thing is 560.210C2, which indicates that there are still two things that are still prohibited. One is a provision for marketing and business consulting services and also incomplete works. But in this case, first of all, the copyrights are completed works. But it also actually authorizes prepayments for incomplete works such as periodicals, et cetera. The other section which is important is 560.509. It says all of the following transactions in connection with patent, trademark, copyright or other intellectual property in the United States or Iran are authorized. And pursuant to this section, it gives the Iranian entity to register patents, trademarks and copyrights in the United States and to enforce those registrations. It also is bilateral. In other words, it allows U.S. entities to apply for patents, trademarks and copyrights in Iran and to enforce those registrations in Iran. Counsel, how do you understand the phrase marketing in Part C2? It seems to be within the context of information and informational materials. It's not, Your Honor. It is talking about you can't do marketing and business consulting for that type of work or to promote that type of work. In fact, we've referred to, in fact, the defendants and the appellees' assignments which have marketing and business consulting provisions in them. Marketing and business consulting is I receive something of value and I will promote your work. In this case, all Plaintiff Kalantari did was he actually is paying money. He's not receiving anything. He's paying money to obtain the motion pictures. And what he's doing is he's promoting his own motion pictures, the showing of them in the United States, which, again, is commercial speech and squarely within the First Amendment rights. It's marketing but not marketing services. That's correct. It is not marketing services for entities in Iran. It is only advertising the showing of the motion pictures and something about the motion pictures while it's advertising the U.S. To an extent, however, the success of the marketing impacts the amount of money that the Iranian entity gets paid. So... That is true, Your Honor. Therefore, it has an interest in successful marketing. Well, again, there's a difference. There's a line here. If, and I could point to the line which, for example, the defendants, what they did was they said we get an assignment, we show the motion pictures, and here's what we're going to do. We're going to say, we're going to promote all kinds of good stuff about Iranian movie industry, about Iranian actors and actresses. But that's not what the plaintiff and the accountant did in this case. What he said was we will bring in the motion picture, we show it, and all he did, and all the evidence shows, is the only thing that he did is he advertised time, place, and date of the showing of the motion pictures, which are squarely within First Amendment rights. He also indicated a brief synopsis of the storyline of the motion picture, and he indicated whether the motion picture had won any rights or acclaim in international film festivals. That's the basis of all his activities in promoting the motion picture and the showing. And all of his activities are squarely within First Amendment rights. Those have been determined by a number of cases in commercial speech, and still, again, regulations don't even apply. Congress has balanced the rights itself between First Amendment rights and between anything that might happen under the embargo as far as trade regulations and has determined that the President does not even have the power to directly or indirectly ban or restrict the importation of information, informational materials. If I understand NITV's, the heart of NITV's argument, it is that all of that aside, what you didn't have a right to is to an assignment of the copyright, such that you have the exclusive right to publish, distribute, et cetera. Your Honor, as I said, either all of these. And they are quite correct that neither the statute nor the regulations explicitly, in terms, exempts or allows assignment of copyright rights. No, I think that's incorrect, Your Honor. First of all, as I mentioned, there's 560.509. Now, either all of Kalantari's activities fall within the First Amendment rights and are not subject to regulations. Wait a second. I'm sorry. Just say it again. Either all of his activities fall within First Amendment rights, which are not. Well, no, wait a minute. We're not in the Constitution land here. We're in the specific regulatory regime. Well, Your Honor, that's the whole point is. Well, that may have been the point for doing it. But that doesn't answer the question about who has the ability to convey copyright. Let us suppose, put differently, you have the unquestioned right to buy the film. Correct. Okay. And pay for it. That's correct. Okay. And perhaps have the right to use it. Correct. Because otherwise, why would you buy it? Correct. But if I understand NITV's pitch, it is that you do not have the right to acquire exclusive copyright rights in these films, such that other uses in this country can be prohibited by you. Your Honor, as I'm trying to explain, if the Iranian entity did not have the original Iranian entity and did not have that right in the United States, you would be absolutely correct. But that right has been conferred. 560.509 says, all of the following transactions in connection with patent, trademark, copyright, or other intellectual property protection in the United States or Iran are authorized. The filing and prosecution of any application to obtain a patent, trademark, or copyright. The authorization to pay for services, payment for such services. Payment for services. I've read this maybe 50 times. Okay. So I know what it says. My problem in what I'm looking to you to help me with, because you're the expert, is to explain to me what these words mean. Because I can't just understand, okay, with specific reference to what your opponents say, which is that nowhere in here is there mention of an assignment of copyright rights to an American company. How do you tweak that right out of this set of words? And I'm just trying to get that. I will get to it faster, a little quicker. Okay. What I was trying to do is establish that the Iranian entity does have rights in the United States itself. Yes. To obtain registrations and to enforce those registrations. Now, Section 560.405, number one, inherently, once the Iranian entity has that right, it could assign its rights. If it didn't have its right, that right, it could not assign. Well, but you see. Okay. Yeah. All right. I understand. Look, I'm not trying to quibble with you at all about the common sense of it. Okay. What I'm trying to find is where you tweak that out of these words.  Section 560.405. Transactions. 560.405. .405. Correct. Okay. Transactions incidental to a licensed transaction authorized. Yes. Any transaction ordinarily incident to a licensed transaction and necessary to give effect thereto is also authorized. Yes. In other words, this is a catch-all prize not just for this licensed transaction, but also every other licensed transaction in which the government is saying, You know what? We can't sit here and run regulations little by little as to, well, this part of it you can do and this part of it you can't do. I understand. But you could get a specific license to do it. No. Well, assuming the general license doesn't cover it, you could get a specific license. If a general license is not applicable. Okay. And 509 is the general license. That's correct, Your Honor. And the district court read this, and it's quite susceptible of the reading, that 509A1 just has to do with filing and obtaining a patent or a copyright. That's fairly straightforward. That is, we will let an Iranian entity get copyright protection in this country. That literally says nothing about whether it can use it or not or assign it or not. That portion of it is correct. The patent or copyright is never an authorization to engage in business. Correct. For example, we can apply for a drug patent, and that doesn't necessarily mean that you can market that drug unless the FDA approves it first. So that is absolutely correct. But what we indicated was, first of all, the district court said, You can't even pay money for it. So the district court was in error. But all of the transactions, everything as far as purchasing the motion pictures, obtaining copyright registrations, commercially showing them in movie theaters, those are all transactions that are either licensed or they are within the First Amendment rights and not even subject to the regulations. Okay. Now, are we talking the First Amendment here, or are we talking the fact that your license covers it? I did not understand your argument to be that you were dependent upon the umbrella of the First Amendment. I thought your argument was that it actually was within the scope of the general license. Your Honor, we have been consistently arguing that, in fact, that's where the district court erred. The district court, we said the license, these transactions are exempt from the regulations. The President does not even have the authority to regulate these transactions. Okay. I'm sorry. Maybe I'm needlessly complicating things, and I apologize. I am beyond the exemption. Okay. I don't think there's any question but what you can import that film, and you can pay for it. All right. Okay. Which you did. And if you used the film, presumably you would get in deep trouble with the entity and the Iranian entities. But that's not our problem. Our problem now is that you have sued MITV for copyright infringement. Right? That's right. And they're in turn saying, wait a minute, you can't enforce your copyright because it's illegal. Well, like I said, Your Honor, the copyright registrations clearly indicate on them, number one, that it's an Iranian entity. Yes. Number two, the 560.509 clearly gives that Iranian entity the right to register copyrights as well as to enforce them. And second of all. Yes, but you're not it. But we have – if the Iranian entity has the rights in the United States, that right can be assigned. And Section 560.405, it says any transaction ordinarily incident to a licensed transaction and necessary to give effect thereto is also authorized. Okay. So now let me repeat this and see if I've got it right. The Iranian entity has the right to get copyright protection in this country. That is correct. Because it has the right to get copyright registration and got it, it necessarily has the right to distribute in this country itself? Yes. Itself. No. That would be the First Amendment right of Mr. Calantari as a U.S. entity to do so. I see. So the Iranian company can't use its copyright to distribute or publish in this country. It has to go through an American. If it becomes the American – correct. That is correct. Boy. And so you're saying that because it has the copyright, even though it can't use the bundle of rights itself, it can assign them to an American for money? That's correct, Your Honor. Okay. If you can have the – under the First Amendment, the U.S. entity is allowed to purchase, bring in, commercially use, and distribute the motion pictures all under the First Amendment. If the government did not intend for there to be a exclusivity in that or a monopoly in that, then it simply could have said, you know what, I'm not going to issue the license for patent and trademark copyright exclusivity. Because it did that, then it gave the right – in other words, the licensing portion of the intellectual property is not within the First Amendment. That is clearly within the authority of the President to regulate. And through two administrations of President Clinton and President Bush, that authority has remained in place. So that gives the Iranian entity, therefore, the right to create and confer exclusivity. And based on that, it gave that exclusivity. Now it has the authority to give that exclusivity to Mr. Kalantari, who is a U.S. entity, and to be able to exercise his First Amendment rights. The government is free to take away that license, but it has not done so. In fact, with regard to certain countries, that license does not exist. Your Honor, I'll take the balance of my time. If there's no questions, do I see any questions that Mr. Refkin had? I'll give you time for rebuttal. I took a lot of it. I changed. Good morning. May it please the Court. Martin Refkin for defendants and appellees in ICB-8, Zia adobe and carbine adobe. I want to divide my time into a couple of areas. I want to give you a general overview as I see this appeal. I want to talk about the First Amendment. I want to discuss the executive orders, and I want to apply all of that to the contracts herein. First of all, if this Court were to authorize the transactions that are involved here, we would have money legally going to unknown representatives for alleged agents of unknown assinees of alleged owners of films. Now, at the hearing on the summary judgment motion, counsel for Kalantari stated that, yes, money could conceivably go to fund international terrorism, but that is neither here nor there. And I submit that that is. Well, why is it either here or there? Either something is a prohibited transaction or it isn't, and whether Congress has or has not created a loophole, they have or have not created it. So the ultimate question, whether a payment can be used for a bad purpose, really isn't the question before us, given the broadest of latitude, the language and the interpretation of those executive orders. You must look to the plain language of those in analyzing what is allowed or not. Okay. Help me through this. Let's start with the statute, which says that the authority granted to the president does not include authority to regulate or prohibit directly or indirectly the importation of a commercial film. Absolutely. So it comes in. Absolutely it comes in. And since commercial is there, presumably one can pay for it to someone in Iran who might or might not be a terrorist. Okay. And royalties can be paid. No. See, we have to draw a line here. The transactions involved here are not licensed transactions. They are not, either under 405, they're not licensed. They're clearly not exempt. You say that, but why are they clearly not exempt? Let me finish the question. The coverage talks about transactions in connection with copyright or other intellectual property protection in the United States or Iran. And it would seem to me that that in connection with and the other intellectual property protection would be susceptible, at least, of a reading that would include licensing or assignment, rather, which is an ordinary incident of the copyright world. Why wouldn't it include in the transactions not prohibited the opportunity to assign the rights that are expressly granted there? Because the executive orders themselves were designed as prohibitions. And the language in the executive orders are so broad, they could not think of every circumstance where one could avoid or attempt to evade the purpose of the embargo, and that is embodied in one of the sections. So when we look at 509, 509A simply says that these transactions in connection with, I'll go through, in connection with copyrights are authorized. But what is authorized here? Another intellectual property protection, whatever that means. I understand, but we're talking about copyrights here, so I'll dot, dot, dot through what we're not talking about. And under Item No. 1, it only talks about the filing and prosecution of an application to obtain a copyright. So one may, under 509, apply for and prosecute an application to get a copyright. And you may pay for the importation of that film. And you may pay for services that are directly connected to that obtaining of the copyright. Now, arguably, profits are not services connected with the obtaining of the films. Are you familiar with the Cuban regulations that are under the same statutory? Vaguely. I mean, I've read about regulations for China, for Cuba, just vaguely. And the reason I ask that is that there is an example given in the regulations relating to Cuba that's almost identical to this case. It talks about a United States entity obtaining permission to paying for both upfront and royalties, paying for a master copy of a film and obtaining the exclusive rights to distribute it and so forth, and that being all okay. And I wonder, in your view, what is the difference, if there is one, between the Cuban regulations and the Iranian regulations, whether they should be interpreted differently, and if so, why? Well, to begin with, I'm not that familiar with the Cuban regulations. I don't know if the Cuban regulations were designed to attempt to address the issue of international terrorism and the issue of the acquisition of weapons of mass destruction. There may be some trade issues involved, but the overall purpose for this embargo was based upon international terrorism. And I think we cannot ---- But the statute that it's interpreting is identical. The rubric is the President has no power to prohibit or regulate directly or indirectly a category of transactions. And that statute applies across the board, and that's why I'm asking the question. Well, if we're going to go to First Amendment, because that's the basis upon which it says that you cannot ---- I didn't. I was asking about the statute. I'm trying to understand your view of the statute. All right. I cannot address the statute that deals with the Cuban embargo. I'm just not familiar enough with that. But I can say that here, the only thing that is authorized by the regulations is the filing and prosecution of an application to obtain a copyright. It does not specifically authorize assignments. It does not specifically authorize commercialization of these films. If, in fact, the executive orders were intended to do so, then those activities would have been specifically exempted, as were the other activities in Section 210. 210 only has five items that are exempt. And to stretch the interpretation of 210, because the words all appear in there, commercial, importation and exportation, and to change the meanings of those words or to say that commercialization applies to importation, where there is an inherent right to commercialize these transactions, flies in the face of the purpose for the Iranian transaction regulations. And we have to go back there. We have to continue to look at the clear meaning of the statute here. Now, 405 says that any transaction incident to a licensed transaction, that begs the question, because this transaction or these transactions are not licensed, the owner would have the right to come over and apply for and perhaps obtain a copyright. But the plaintiff, Mr. Kalantari here, did not have that right because, as the district court held, those transactions, those contracts violated the spirit and the actual language of the embargo. Because, and what we need to look back at is, when those applications were filed, when those applications were made, only the English version of the six contracts was submitted. The Farsi contracts, which contain the matter that makes these transactions violate the embargo, those were not submitted. What is the difference that, in your view, makes them prohibited or not? The money going back to the profit payments, going back to the embargo. Unknown people in Iran for unknown purposes. I find that to be the cornerstone of why the Iranian transaction regulations were enacted, just to prevent these. Now, if the plaintiff wanted to obtain a license, a specific license, he can go and apply. And there are plenty of exceptions to the embargo where one goes through the processes to obtain a license. And then, presumably, the Office of Foreign Asset Management Control then monitors these payments. But what we have here is, admittedly, money going to unknown people, and nobody knows what's happening there. Well, let me ask you this. Let's assume that you're correct that royalties can't be paid to persons in Iran. How does that affect the validity of the copyright, the underlying copyright and the exclusivity, the right to exclude others? I can't make a penny, but I can exclude you. Why wouldn't that still be permissible? Because the right to obtain a copyright via assignment is a prohibited transaction, because it is a dealing, it is a transaction involving Iranian goods. Those words appear as part of the prohibitions. A transaction involving Iranian-origin goods is prohibited. Justice Kagan, I have a spin on Judge Graber's question. The reason we're here is because you have asserted an illegality defense to an infringement of copyright action. It's copyright, registration, an assertion of ownership, and there is nothing sort of on its face unlawful about enforcing a copyright. Why isn't what you're talking about simply a merits-based defense to their lack of ownership of the copyright? Because the actual assignments themselves, which give the basis for the copyrights, violate the embargo. They are illegal and unenforceable. So they have a copyright. You're just saying it's a no-good copyright. Well, they have a copyright because they went through the copyright process. You have a copyright, and you say that you're saying it shouldn't be recognized by the courts. Yes, they have the copyright. It should not be recognized because the means by which they obtain the copyright violates the embargo. And therefore, all six of those contracts are illegal, unlawful, and unenforceable, and that's what the district court so held. If you don't have an enforceable contract, a legal contract, the court cannot enforce. Well, that strikes me as being an attempt to regulate or prohibit directly or indirectly the importation of a commercial film, which is something that the President has no authority to do under the statute. Okay. There is nothing that prohibits or prevents the film from coming into this country. It absolutely can. I absolutely concede that point, and the district court so found the importation of the film is legal. But when you weigh whether they have the right to commercialize, which in essence is commercial free speech, that Why are we weighing anything? Either there's a regulation or a statute that says it's okay or not okay. I guess I don't understand what it is you want us to weigh and why that's our business. Well, if we're going to look at the First Amendment and commercial free speech, then commercial free speech clearly occupies a lesser protective stance. Why aren't we just looking at statutes and regulations and what they allow or they don't allow? That's fine. I'm more than happy to look there. The issue of free speech and First Amendment was raised principally in the reply brief, and that's why I wanted to address it. And that free speech and the regulations address the question of whether these films can be brought in. And absolutely, they can be brought in under the First Amendment or under the specific terms of the embargo. But there is no place in the embargo where it says that one who brings a movie in can commercially exploit that movie and can send money back to unknown people in Iran. That's the purpose for the embargo is to prevent the money from going back unless it's licensed, which it isn't, or unless there's a special license, which there wasn't one. So the only way that the embargo, A, makes sense, and B, can be enforced, is you have to draw a line, and the line has to be drawn where the money simply cannot go back into Iran to unknown people for who knows what purposes. That's why I think we have to draw a line. But it can go back for the film. So that's why it's hard for me to see the difference. Well, under 509, you may pay for services directly connected to the obtaining of the copyright. You can't pay profits. You can pay for... Why isn't that directly connected? Some people have contracts for a one-time payment, and some people have royalties. But why isn't it still directly connected to the copyright? Because all that is exempt in this transaction is the obtaining of a copyright. The commercialization of that copyright is not exempt. So, yes, even as the district court said, they can have that right to obtain the copyright. And they could file suit if somebody was infringing on a lawful copyright. Well, you just said they can get the copyright and pay for it. So what's illegal about the copyright? The contract which calls for the assignment and which calls for exclusivity, those acts... What else is a copyright except exclusivity? If President Clinton intended to allow for these transactions, then the whole ambit of copyright protection would have been excluded. And I think the language in 210 is very clear that marketing and business services are not exempt. I think it's very clear there. The man is marketing these bills, and he's going a step further because he's sending the money back to unknown people in Iran. Those don't qualify. Apparently you disagree then with the idea that marketing a product is different than providing marketing services. Marketing a product that you have to sell is different than providing marketing services. No, I don't disagree. Where I disagree is if Mr. Kalantari would have marketed this product, would have sold it here, and not sent money back to these unknown people in Iran, those transactions would not have been subject to the embargo. That's where we draw the line, because the embargo says you can't engage in these transactions. You can't have these dealings. You can't have these investments. The language is very, very broad, and the language goes further to talk about including but not limited to. There's so many qualifiers or expanders, if you will, in the embargo, because you just couldn't think of all the ways in which somebody might try to avoid or evade the purpose of the embargo, and that's what we have here. We have this money going back, which either directly violates, or it evades, or it attempts to violate the embargo, all of which would make the transactions underlying the copyrights of contracts illegal and unenforceable. I assume my light is almost out. Are there any other questions? I don't think so. I thank you very much, Your Honor. Thank you. Your Honor, just a few points. First of all, as far as royalties are concerned, royalties are a very normal part of intellectual property contracts, whether it's the assignment of whether it's a licensing of a technology, whether it's books. Royalties are a form of payment for any type of intellectual property, and specifically informational materials such as commercial motion pictures. To have a regulation on the method of payment for those types of intellectual property and informational materials would be a violation of the First Amendment because it would be a direct regulation of the importation and exportation of informational materials. Now, the Supreme Court cases have held the fact that motion pictures or commercial endeavors does not alter their protective status. This is Joseph Gerstein, Inc. v. Wilson, Supreme Court decision. In Buckley v. Vallejo, the Supreme Court stated that the ---- Do you need to get to the constitutional argument to win? Your Honor, the defendants keep moving. Now, I'm asking you a yes or no question. Do you need to have us get all the way to a constitutional argument to win your case? Yes, Your Honor. I think that the ---- You don't think the statute and the regulations are enough? Well, the statute is enough because in it, it has incorporated the fact that the reason for excluding from the presidential powers the right to restrict or ban informational materials was because of a First Amendment issue. And so when the defendants claim that commercialization is not allowed and you can't send money back to Iran, commercialization, as I just mentioned, motion has found by the Supreme Court that commercialization, even the motion pictures, require commercialization. That is a First Amendment that is clearly within the First Amendment rights, and that's an activity that can be done. As the defendants also admitted, the fact that you advertise is commercial speech and that is protected by the First Amendment. Every activity that Mr. Calantari has done in this case is protected by the First Amendment. Therefore, we don't even need to consider the regulations of 31 CFR 560. We don't even get to a balancing test. The Congress has already done the balancing test. Congress' House report says commercial informational materials were exempted from the general prohibitions of the regulations to ensure that the embargo did not ban or restrict the import or export of information protected under the First Amendment. The only other issue here is the government, through its wisdom, because it wanted to create a bilateral relationship with Iran so that not just Iranian entities have the right to register and enforce their copyrights in the United States, but U.S. entities will have the right to register their copyrights in Iran and to enforce their rights in the United States. As we indicated from the Senate report on the Berne Convention, the U.S. is the largest exporter of information, informational materials, for which there's a huge surplus. We will be shooting ourselves in the head. It is not just a First Amendment issue, but it is a – it is also a commercial issue where the U.S. exporters of information and informational materials will be hurt. Any restriction that the Court applies to the importation will necessarily apply to exportation. In this case, I think it would be harmful to every entity except for, I guess, the defendants. One other point I'd like to make, Your Honor. The other thing – there are other well-recognized entertainment companies such as Sony Pictures, Miramax, et cetera. These are all importing informational materials, motion pictures, from Iran. They are commercializing them. They are advertising them. They're promoting them. And if their copyright registrations are invalidated, then it would be open season for their motion pictures and everybody's business with regard to pirates such as NIT. Thank you very much. That's the argument made in the brief. I understand it. Thank you, counsel, for your argument. The matter just argued will be submitted.
judges: B. Fletcher, Rymer, Graber